UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHARLENE CRAWFORD                                                               PLAINTIFF

v.                                       No. 5:18-CV-05018

KARCHER NORTH AMERICA, INC.                                                    DEFENDANT

**OPINION AND ORDER**

Before the Court is Defendant Karcher North America, Inc.'s ("Karcher") motion (Doc. 31) for summary judgment, brief (Doc. 32) in support, and statement of facts (Doc. 33). Plaintiff Charlene Crawford has filed a response (Doc. 35) in opposition, a brief (Doc. 37) in support, and a statement of facts (Doc. 36). Karcher filed replies to Crawford's response (Doc. 42) and statement of facts (Doc. 41). For the reasons set forth below, Karcher's motion for summary judgment will be GRANTED.

**I.     Background**

Defendant Karcher North America, Inc. is a "manufacturer of commercial, industrial, and consumer cleaning equipment." (Doc. 36, p. 1, ¶ 2). Karcher is headquartered in Denver, Colorado and has a distribution center in Fayetteville, Arkansas that employs ninety workers. *Id.* at ¶¶ 2-3. Ed Taylor is the Director of Operations at Karcher's Fayetteville facility. *Id.* at ¶ 6. This is the top leadership position at the Fayetteville facility. (Doc. 33-1, p. 13). Plaintiff Charlene Crawford worked at Karcher's Fayetteville facility as warehouse manager. (Doc. 36, p. 2, ¶ 10). In this role, Crawford reported directly to Taylor and managed fifty-nine employees. (*Id.* at ¶ 11; Doc. 36, p. 20, ¶¶ 66-67). Crawford was recruited to Karcher by Taylor. (Doc. 36, p. 1, ¶ 8). Crawford and Taylor had worked together at a different company before Taylor began working at Karcher. *Id.* at ¶ 7. Crawford was hired at Karcher as a shipping supervisor. (Doc. 33-1, p. 4). Taylor

1

promoted Crawford to her position as warehouse manager in May of 2012. *Id.* At the time, Crawford and Taylor had a "good working relationship." (Doc. 33-1, p. 5). However, Crawford began complaining of issues with Taylor's management of the facility to Amber Hollinger, Karcher's on-site human resources generalist, around July of 2013. (Doc. 36, p. 2; Doc. 33-1, p. 5). Crawford complained on many occasions of Taylor's demeaning communication with her and other employees. (Doc. 33-1, pp. 5-6). Crawford alleges that Taylor was demeaning regardless of who was around. *Id.* at 6. When Crawford complained to Hollinger, she "discuss[ed] the issues of the people that were having issues with him. And that was all women." (Doc. 33-1, p. 7). Crawford also complained about Taylor's lack of professionalism and frequent absences. (Doc. 33-1, p. 149). However, Crawford does not recall specifically complaining to Hollinger that she felt that Taylor treated women differently than men. *Id.* Hollinger did not believe that Crawford was complaining that Taylor treated her differently because she was a woman. *Id.* Despite Crawford's complaints spanning as far back as 2013, Crawford did not believe that her initial complaints to Hollinger led to her firing. (Doc. 33-1, p. 10). Rather, Crawford believes that her firing was a result of the incidents that occurred from April 12, 2016 until she was terminated. *Id.*

On April 12, 2016, after a weekly meeting with the managers and team leads, Taylor asked Crawford, Hollinger, Blaine Ahrents, and Franci Wood to stay after to discuss an upcoming facility town hall meeting. (Doc. 36, p. 6, ¶ 25). During the discussion, Crawford asked Taylor for more details regarding the meeting and Taylor responded, "It'll be 30- or 40-something." *Id.*, ¶ 26. Crawford then said "Ed, I need to know." "Ed, I need to know how much, because our people are

working overtime, and I need to be able to account for it." *Id.*[1] Taylor then stated, "it's going to happen anyway." *Id.* Crawford replied by saying "You don't have to be hateful in your response." *Id.* Taylor retorted, "I'm not the one being hateful. You are." (Doc. 33-1, p. 14). Crawford then "turned around, walked off, . . . [and] said Dude." *Id.* After the meeting ended, Hollinger went to Ahrents office to assist him with a personnel issue. (Doc. 33-1, p. 50). Ahrents brought up the earlier incident to Hollinger. Ahrents said that if Crawford "w[as] any other person/manager we would have been written up for that behavior." *Id.* Hollinger also stopped by Wood's office to see how she had perceived the interaction. *Id.* Wood felt that Taylor's demeanor during the incident was not rude but firm in direction when challenged. *Id.* Wood also interjected that "she was not going to be bullied anymore" by Charlene. *Id.* Hollinger later met with Taylor and brought up the earlier incident. *Id.* Hollinger recommended to Taylor that he address Crawford's inappropriate behavior during the meeting to prevent the behavior from continuing to occur. *Id.* Hollinger also discussed the concerns and issues that had arisen regarding Charlene's conflict-centric leadership style[2] and complaints that Charlene and others had raised about Taylor's lack of professionalism and seeming disinterest in his job responsibilities. *Id.* Taylor decided to discuss the issues with Crawford and Hollinger and Taylor discussed strategy and approach for coaching Crawford. *Id.* Taylor drafted a talking points memorandum for his meeting with Crawford.

---

[1] In the "summary of events" email that Amber Hollinger sent to Karcher Executive Vice President of Human Resources Lauren Choate, Hollinger noted that Crawford used a strong tone during the interaction and "challenged [Taylor] with raised voice and said that he needed to watch his hateful attitude." (Doc. 33-1, p. 50).

[2] Annette VonAch, a subordinate of Crawford, complained to Hollinger that Crawford "made [her] feel 2 inches tall or that [she] was a speck of dirt on the ground." VonAch had complained about Crawford to Hollinger over a "number of years." (Doc. 33-1, p. 140). Robert Taylor, Raul Porras, and Walter Quinn had complained about Crawford's conflict-driven nature and poor leadership skills. *Id.* John Schafer left Karcher "mainly because of [Crawford] . . . ." (Doc. 33-2, p. 9).

(Doc. 33-2, pp. 30-31).

On April 13, 2016, Taylor and Hollinger met with Crawford to discuss her behavior at the previous day's meeting. (Doc. 36, p. 9, ¶ 31). Taylor read straight from his talking points. (*Id.*, ¶ 32; Doc. 33-1, p. 16). The meeting was intended to be a coaching session, rather than a disciplinary action. (Doc. 33-1, pp. 150-51; Doc. 33-1, p. 108). Crawford was "shocked" by the feedback she received from Taylor and believed that it was "retaliation" for speaking up to Taylor the day before. (Doc. 33-1, p. 16; Doc. 33-1, p. 21). During the April 13 meeting, Crawford requested an investigation into the allegations that she was a "bully" and had "steamrolled" fellow employees. (Doc. 33-1, p. 17). Crawford specifically requested the identity of the individual making the allegations and examples of her conduct. *Id.* Crawford reiterated her request for the investigation in a follow-up email on April 13 at 4:49 p.m. (Doc. 33-1, p. 64). On May 2, 2016, Lauren Choate, Executive Vice President of Human Resources at Karcher, emailed Crawford and notified her that Hollinger had informed her of the April 12th incident, the April 13th meeting, and Crawford's request for an investigation. (Doc. 33-2, p. 32). Choate's email affirmed that Karcher was looking into Crawford's concerns and that Karcher would honor the confidentiality of the employees who raised those concerns. *Id.* In response, Crawford sent an email explaining that she believed her issues with Taylor should have been addressed before and that she felt like Taylor was retaliating against her for speaking up at the meeting. (Doc. 33-2, p. 32). Dan Spickard, Executive Vice President of Operations and Integrated Supply Chain and Taylor's boss, then responded to Crawford and told her that they would discuss the issues in their one-on-one meeting they would have the following week when he was at the Fayetteville facility. (Doc. 33-2, pp. 33-34). Spickard explained that Crawford's email came across as unprofessional and disrespectful to the people attempting to bring her issues to an acceptable resolution and that he would not tolerate personal

4

attacks or a demanding tone in the upcoming meeting. *Id*. Spickard met with Crawford and Crawford explained her side of the story. (Doc. 33-1, p. 23). Crawford claims that Spickard threatened her not to pursue investigation into who made the allegations against her. (Doc. 33-1, p. 23).

Early in 2017, Crawford was involved in two incidents that raised concerns from Karcher leadership. On February 1, 2017, Crawford was given a verbal warning for failing to inform Taylor about an incident in the warehouse that occurred on January 27, 2017. (Doc. 36, p. 14, ¶ 51). On that day, Taylor Stroud, one of Crawford's subordinates damaged a vendor's trailer at the Karcher Fayetteville facility. (Doc. 36, p. 13, ¶ 44). Crawford was at work on the day of the incident and was notified by Jose Avila, a team lead for Crawford, that an incident occurred at 10:13 a.m. (Doc. 33-2, p. 45). However, Crawford failed to notify Taylor, the vendor, or any other manager at Karcher Fayetteville about the incident. (Doc. 33-1, p. 93). Taylor was not informed about the incident until the vendor told him about the damage to the trailer. (Doc. 33-1, p. 92). Taylor, Kristin Conlon, Dan Spickard, and Lauren Choate collectively decided to give Crawford a verbal warning because as the manager on-site, she had the "ultimate responsibility for [Karcher] equipment and . . . the equipment of [Karcher's] vendors . . . [and] she did not do her role as the leader on-site."[3] (Doc. 33-1, p. 127; Doc. 33-1, p. 70).

On March 11, 2017, Annette VonAch, Crawford's subordinate, fell in the bathroom at the Fayetteville facility and hit her head on a metal beam. (Doc. 33-1, p. 78). VonAch was unable to get the door open to exit the stall and Jose Avila had to climb into the stall to help her out.

---

[3] Crawford believes that she was treated differently than Avila and Stroud because she was disciplined for the incident while her male subordinates were not. However, this argument is nonsensical because it was her choice not to recommend disciplinary action for her subordinates for their role in the warehouse incident. (Doc. 33-1, p. 29).

(Doc. 36, p. 14, ¶ 53). VonAch was slurring her words and her eyes were shaky. (Doc. 33-1, p. 78; Doc. 33-1, p. 32). Michelle Hernandez, another employee in the warehouse, called Crawford, who was not on-site on that day, to notify her of the incident. (Doc. 33-1, p. 78). Crawford asked to speak with Avila because he was the trained first responder on duty. (Doc. 33-1, p. 32). Avila explained the situation to Crawford and then allowed Crawford to speak with VonAch. *Id.* Crawford asked VonAch if she needed to go to the doctor, and VonAch said no. *Id.* VonAch said that she was fine and that she just had a headache. *Id.* Crawford directed Hernandez and Avila to move VonAch to her office and when Annette suggested taking a fellow employee's aspirin, Crawford directed VonAch to go ahead and take it. *Id.* After waiting for a period of time, Hernandez and Avila drove VonAch home. *Id.* Crawford did not notify human resources of the injury until March 14, 2017, three days later. (Doc. 33-1, p. 76). Karcher's worker's compensation policy required that an on the job injury report, including the "Supervisor's Accident Investigation Report" be forwarded to human resources within twenty-four hours of the time the injury occurred. (Doc. 33-1, p. 74). Karcher Executive Vice President of Human Resources Lauren Choate felt that Crawford had mishandled the situation by failing to inform human resources or Taylor of the incident in a timely manner. (Doc. 33-2, p. 54). Choate also believed that Crawford incorrectly failed to consider the incident as a Worker's Compensation incident. *Id.*

On March 14, 2017, Choate emailed Dan Spickard recommending that Crawford's position be terminated and the Fayetteville facility move forward with the reorganization because of Karcher's CEO's directive to shrink the company's workforce, "this recent incident, and the plethora of other issues . . . ." (Doc. 36, p. 17, ¶ 60). Taylor notified Crawford of her termination on March 28, 2017. (Doc. 33-2, p. 60). Crawford's separation notice informed her that her separation was due to "organizational changes within the department." (Doc. 36, p. 25, ¶ 76).

From 2016 moving forward, Karcher had begun looking for ways to increase organizational efficiency. (Doc. 36, p. 19, ¶ 61). Plant managers "were being forced to look for ways to be more cost efficient." (Doc. 33-1, p. 90). Restructure of the Fayetteville warehouse had been in the plans for two years. (Doc. 33-1, p. 26). Karcher was struggling financially, leading Dan Spickard to begin evaluating the company's organizational structure. *Id.* In December of 2016, Taylor proposed to Spickard the elimination of the warehouse manager position and promotion of the current team leads to supervisors.[4] (Doc. 36, p. 20, ¶ 71). Taylor believed that respected former employee John Schafer would not have left if Crawford's position would have been eliminated. (Doc. 33-2, p. 56). The reorganization plan reduced headcount at the facility by one. (Doc. 36, p. 21, ¶ 72). Karcher considered the warehouse manager position in the Fayetteville facility as unnecessary. (Doc. 33-1, p. 133). On March 9, 2017, Dan Spickard, Lauren Choate, Kristin Conlon, a Karcher human resources generalist, and Ed Taylor all agreed on the elimination of the warehouse manager position. (Doc. 36, p. 22, ¶ 74; Doc. 33-2, p. 9). Terminating the warehouse manager position allowed Karcher to meet their "financial goals," and remove Charlene from the Fayetteville facility. (Doc. 33-1, p. 132). Karcher is closing its Fayetteville facility in 2019 due to financial considerations. (Doc. 36, p. 12, ¶ 78).

II.     **Analysis**

When a party moves for summary judgment, it must establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). In order for

---

[4] Crawford had previously supported a warehouse restructure plan that included moving the team leads into supervisor positions. (Doc. 33-1, p. 26).

7

there to be a genuine issue of material fact, the nonmoving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66–67 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Only facts "that might affect the outcome of the suit under the governing law" need be considered. *Anderson*, 477 U.S. at 248. "[T]he non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof." *P.H. v. Sch. Dist. of Kan. City, Mo.*, 265 F.3d 653, 658 (8th Cir. 2001) (quotation omitted). Facts asserted by the nonmoving party "must be properly supported by the record," in which case those "facts and the inferences to be drawn from them [are viewed] in the light most favorable to the nonmoving party." *Id.* at 656–57.

### A. Gender Discrimination Claim

Crawford's complaint alleges that Karcher discriminated against her on the basis of her gender and retaliated against her for reporting instances of gender discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, and the Arkansas Civil Rights Act ("ACRA"), Ark. Code Ann. § 16-123-107.[5] These laws prohibit employment discrimination on the basis of protected class characteristics—and relevant to this case, on the basis of gender. In a gender discrimination action, a plaintiff's case survives summary judgment if the plaintiff presents direct evidence of discrimination showing a specific link between discriminatory animus and the adverse action, and if that evidence could support a reasonable finding that the discriminatory

---

[5] Arkansas evaluates ACRA gender discrimination cases using the same analytical framework courts use to evaluate Title VII gender discrimination cases. *See Greenlee v. J.B. Hunt Transp. Servs.*, 342 S.W.3d 274, 277–79 (Ark. 2009); *see also Brodie v. City of Jonesboro*, No. 11-563, 2012 WL 90016, at *2 (Ark. Jan. 12, 2012)("This court has previously applied the *McDonnell Douglas* framework in reviewing the grant of a summary-judgment motion in an employment-discrimination case, . . . and Brodie fails to provide convincing argument that would cause us to reconsider our use of the framework.")

8

animus motivated the adverse action. *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007) (citing *Russell v. City of Kan. City, Mo.*, 414 F.3d 863, 866 (8th Cir. 2005)). Direct evidence is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the factfinder to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993) (quoting *Ostrowski v. Atl. Mut. Ins. Co.*, 968 F.2d 171, 182 (2d Cir. 1992)); *see also Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011) (explaining that "direct" evidence here is not the converse of "circumstantial" evidence but instead "refers to the causal strength of the proof").

"Alternatively, if the plaintiff lacks direct evidence of discrimination, the plaintiff may survive the defendant's motion for summary judgment by creating an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *McGinnis*, 496 F.3d at 873. Crawford admits that she has no direct evidence of discrimination. (Doc. 37, p. 3). If her case is to survive summary judgment on either federal or state law grounds, she must produce sufficient evidence under the *McDonnell Douglas* test that unlawful discrimination played a role in termination of her employment. If she is unable to do this, she cannot meet her Rule 56 burden and summary judgment will be granted.

1. **McDonnell Douglas Test**

Under *McDonnell Douglas*, in order to create an inference of unlawful gender discrimination, a plaintiff must first establish a prima facie case of discrimination by presenting evidence showing that: "1) she is a member of a protected group; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) she was discharged under

9

circumstances giving rise to an inference of discrimination." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011). In establishing a prima facie case, "the plaintiff's burden 'is not onerous.'" *McGinnis*, 496 F.3d at 873 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If a prima facie case is established, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for its adverse employment action. *Wierman*, 638 F.3d at 993. If the defendant can do so, the prima facie case is rebutted and no inference of unlawful discrimination is created, unless the plaintiff can produce sufficient evidence to create a genuine issue of material fact as to whether the articulated reason is pretext for unlawful discrimination. *Id.* Although the burden of production shifts between the parties, the burden of persuasion remains on the plaintiff at all times. *Fatemi v. White*, 775 F.3d 1022, 1041 (8th Cir. 2015).

        **a.**        **Prima Facie Case**

Applying the first stage of the *McDonnell Douglas* test, it is accepted on this motion that Crawford belonged to a protected class (she is female), that she was qualified for her position (she had received good performance reviews), and that she suffered an adverse employment action (she was fired). However, Karcher argues that Crawford has produced no evidence to show that she was discharged under circumstances giving rise to an inference of unlawful discrimination—that is, that she was fired on account of her gender. Crawford responds that she has presented evidence sufficient at this stage to show that her gender "played a role in Choate's decision to fire her." (Doc. 37, p. 3). Crawford specifically asserts that she was treated less favorably than Ed Taylor, Director of Operations at Karcher's Fayetteville facility because she and other Karcher employees had reported his gruff behavior, lack of professionalism, and poor attendance to human resources and he was not terminated by Karcher. *Id.* However, as discussed in the pretext section below,

Crawford has not satisfied her burden of demonstrating that she and Taylor were similarly situated employees. As a result, Crawford has not established a prima facie case of gender discrimination.

### b. Legitimate Nondiscriminatory Reasons

However, even if Crawford established a prima facie case, Karcher has articulated legitimate nondiscriminatory reasons for Crawford's termination. In the *McDonnell-Douglas* analysis, once Crawford establishes a prima facie case of gender discrimination, the burden of production shifts to Karcher to articulate legitimate nondiscriminatory reasons for Crawford's discharge. If Karcher offers a legitimate nondiscriminatory reason for the adverse action against Crawford, it rebuts the prima facie presumption. *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 259 (8th Cir. 1996). Karcher argues that Crawford was terminated because it determined that it was time to eliminate the warehouse manager position "as part of a broader effort to reduce costs throughout the company." (Doc. 32, p. 1). Karcher also admits that it "made the decision after two troubling incidents in January and February 2017 that caused Karcher to conclude that it was time to move ahead with the long-contemplated job elimination." *Id.* The Eighth Circuit Court of Appeals has held that decline in revenue, prompting a reduction in force is a legitimate business reason to terminate an employee. *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 955 (8th Cir. 2001). The Eighth Circuit has also held that "insubordination and violation of company policy are legitimate reasons for termination." *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003). Crawford does not attempt to persuade the Court that the reasons articulated by Karcher do not qualify as legitimate nondiscriminatory reasons for termination of employment, so unless she can establish a genuine dispute of material fact with respect to whether Karcher's articulated reasons are pretext for unlawful discrimination, any presumption of discrimination created by her prima facie case is rebutted.

### c. Pretextual Reasons

For Crawford's case to survive summary judgment, she must now produce evidence that Karcher's articulated reasons for her dismissal were pretext for unlawful discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–16 (1993) (holding it is not enough that a plaintiff show that an employer's stated reasons were pretextual, but the plaintiff must also show that the underlying reason was unlawful discrimination); *EEOC v. Kohler Co.*, 335 F.3d 766, 773 (8th Cir. 2003) ("If a defendant makes this showing [by presenting evidence of a legitimate, non-retaliatory reason for the adverse action], the plaintiff must then establish that the defendant's proffered reason was pretext and that [unlawful discrimination] was a motivating reason for the defendant's decision."). Crawford can show that any of Karcher's reasons were pretext for unlawful discrimination by "showing the proffered explanation has no basis in fact" or "directly persuad[ing] the court that a prohibited reason more likely motivated" Karcher. *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015). Crawford attempts to make both showings. To succeed she must produce "more substantial evidence than a prima facie case because unlike evidence establishing a prima facie case, evidence of pretext is viewed in light of the employer's justification." *Id.* Crawford argues that Karcher's proffered reasons for her termination have no factual basis. On this issue "[t]he crucial inquiry . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861–62 (8th Cir. 2009). Crawford also attempts to persuade the Court that unlawful discrimination was a motivating factor in Karcher's decision by arguing that Ed Taylor—a similarly situated employee at Karcher—was not terminated for engaging in similar conduct. The Court will address the arguments on each of Karcher's articulated reasons in turn.

### i. Karcher's Reasons for Firing Crawford had no Factual Basis

Crawford asserts that Karcher's proferred reasons for Crawford's termination have no basis in fact. However, there is ample evidence that Karcher had been looking for ways to restructure the warehouse to increase cost efficiency and provide more employees with leadership opportunities. Karcher had struggled financially and multiple Karcher employees agreed that the warehouse manager position at the Fayetteville facility was unnecessary. In addition, Crawford had developed a reputation in the facility with male and female employees as rude, condescending, difficult to work for, and aggressive. Finally, although Crawford spends significant time disputing specific facts of the two incidents Karcher points to as examples of poor managerial choices, the inquiry only requires the Court to look at whether the employer had a good faith belief that the employee engaged in conduct that was inappropriate. *See Harvey v. Anheuser Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994)("Federal courts do no sit as a super-personnel department that reexamines an entity's business decisions . . . . Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior."). Kristin Conlon, Taylor, and Choate all agreed that Crawford's conduct in the two incidents was inappropriate and did not appropriately apprise her superiors and human resources about the situations. Viewing the evidence in the light most favorable to Crawford, there are facts that support each of the stated reasons Karcher has put forth as to why Crawford was terminated. Crawford's termination may have been targeted, as demonstrated by the reduction in force that eliminated only Crawford's position, but Karcher's purposes appear to be lawful ones – decreasing operational costs and removing a widely disliked manager from the facility.

### ii. Treated Less Favorably than Similarly Situated Males

Crawford's gender discrimination claim hinges on her ability to prove that she was treated

less favorably than similarly situated males. Crawford asserts that she was treated less favorably than Ed Taylor. Crawford claims that although she was in a "one of" position as the warehouse manager for the Fayetteville facility, she and Ed Taylor, Director of Operations at the Fayetteville facility, were similarly situated because they both were "managers" and occupied positions of "trust and fidelity."[6] "The test to determine whether employees are 'similarly situated' to warrant comparison is a 'rigorous' one." *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 775 (8th Cir. 2003). Crawford must demonstrate that she dealt with "the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* Generally, a plaintiff is not considered similarly situated to her supervisor. *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 778 (8th Cir. 2012); *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365 (7th Cir. 2009); *Lee v. Lexicon, Inc.*, No. 4:11CV00526, 2013 WL 1445656, at *6 (E.D. Ark. Apr. 9, 2013); *Michaelson v. Waitt Broad., Inc.*, 187 F.Supp.2d 1059, 1072 (N.D. Iowa 2002). The plaintiff must also prove that she was treated differently from those employees whose violations were of "comparable seriousness." *Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir. 2001).

Crawford attempts to paint both her position and her disciplinary record as equivalent to those of Taylor. First, Crawford and Taylor were not similarly situated positionally. Taylor was in charge of the entire Fayetteville facility. His role and responsibility was to oversee the overall financial and logistical operation of the facility. Crawford alternatively was the warehouse manager. Although she did supervise nearly half of the workers employed by the facility, her

---

[6] Crawford notes in deposition testimony that she was a leadership tier below Taylor at the Fayetteville facility. (Doc. 33-1, p. 13). Crawford also admits that rather than being considered second-in-command, she was on the same level of management as Franci Wood, Walter Quinn, and Blaine Ahrents. *Id.*

responsibilities and her expectations limited her responsibilities to overseeing shipping and logistics at the facility. As a result, Taylor and Crawford were tasked with significantly different job responsibilities and expectations. Karcher had chosen to place the responsibility of achieving facility-wide success on Taylor based on his expertise and experience with the company. Although Crawford served an important role in the Fayetteville operation, she was not tasked with such overarching responsibility.

Crawford also argues that she and Taylor had violations of "comparable seriousness." Crawford does present evidence that other Karcher Fayetteville employees had complained about Taylor's unprofessionalism and poor attendance. Conversely, Crawford had alienated many of the employees at the Fayetteville facility. As many as six different employees, both men and women, had either complained to human resources or shared in exit interviews that they did not want to work with Crawford because of her poor leadership and volatile temper. In addition to her challenging behavior characteristics, Crawford was also centrally involved with two incidents that demonstrated poor management. First, Crawford was notified on January 27, 2017, that her subordinate had punctured a vendor's trailer while loading products onto it. Jose Avila had been tasked with drafting the incident report and when it was complete, Avila sent it for review to Crawford's email. Crawford however, did not instruct Avila to send it to her peers and Taylor. Nor did Crawford notify Taylor of the incident herself. Rather, Taylor was informed of the incident from the vendor when its trailer returned with a puncture in it. This resulted in Crawford receiving a verbal warning for her failure to notify her superiors of the incident.

On February 11, 2017, Crawford was also notified of one of her subordinates fainting in the restroom and hitting her head on the restroom stall. Avila called Crawford to seek guidance on how to proceed and Crawford instructed VonAch to go to her office and sit down and

encouraged VonAch to take advil from another employee. Crawford did not notify human resources of the incident until three days later.

Crawford correctly points out that Taylor was known for being rude and short with employees and seemed disinterested in his job at times. However, Crawford presents no evidence that Taylor violated company policies or mismanaged the facility. Furthermore, Taylor was coached multiple times by Amber Hollinger and Kristin Conlon regarding his leadership style and approach. It is certainly true that Taylor's job as the head of the Fayetteville facility was retained while Crawford's job was terminated. However, Taylor was the leader of the entire facility and Crawford's job was considered by multiple Karcher employees as unnecessary and duplicative of the team lead roles below Crawford. Crawford's evidence is insufficient to persuade a factfinder that Karcher's choice to eliminate her role in the Fayetteville facility was anything more than a business decision to utilize company resources more efficiently and to remove an insubordinate personality in one fell swoop.

B. **Retaliation Claim**

Crawford also claims that she was retaliated against for reporting sex discrimination. To establish a prima facie case of retaliatory discrimination under Title VII and ACRA,[7] a plaintiff must show: (1) that she engaged in protected activity; (2) that the defendant took an adverse employment action against her; and (3) that but for her protected activity, the defendant would not have taken the action against her. *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 632 (8th Cir. 2005); *see also Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737-38 (8th Cir. 2013) (explaining a plaintiff must show that retaliatory animus was the determinative "but for" cause of the adverse

---

[7] "To overcome summary judgment on a retaliation claim under ACRA, a plaintiff must make the same showing as is required on an analogous claim under Title VII." *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 861 (8th Cir. 2005).

action, rather than merely a motivating factor). The plaintiff need only make a minimal showing to establish a prima facie case before the burden of production shifts to the employer. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002). "If the employer comes forward with evidence of a legitimate, nondiscriminatory reason for its termination of the employee, the employee must then point to some evidence that the employer's proffered reason is pretextual." *Id.* To establish that retaliatory motive (and not the proffered reason) was the cause of his termination, the employee must show that the proffered reason is "unworthy of credence." *Id.* at 833-34. Though a strong prima facie case can sometimes accomplish this, establishing pretext generally requires more substantial evidence than a prima facie case. *Id.* at 834.

Karcher argues that Crawford has failed to establish her prima facie case because she did not engage in a protected activity and she cannot prove that but for her complaints, Karcher would not have terminated her. "Complaining about a fellow employee but failing to mention that the undesirable behavior was based on the plaintiff's membership of a protected class is not statutorily-protected conduct." *Terry v. G4S Secure Sol. (USA), Inc.*, No. 4:18CV00118, 2018 WL 1701311, at *2 (E.D. Ark. Apr. 6, 2018). "General complaints concerning employment practices or decisions that are not expressly characterized as complaints of gender discrimination do not constitute protected activity under Title VII." *Middleton v. Am. Stand. Co.*, No. 06-2205, 2007 WL 2746757, at *6 (W.D. Ark. Sept. 20, 2007). Crawford admits that she never alleged gender discrimination specifically and only "discuss[ed] the issues that people were having with [Taylor]. And that was all women." (Doc. 33-1, p. 7). Hollinger, a trained human resource professional, did not perceive Crawford's complaints about Taylor's demeaning personality and lack of attendance at the facility as complaints regarding gender discrimination. As a result, Crawford did not engage in protected activity under Title VII.

17

Even if the Court were to find that Crawford had engaged in protected activity, Crawford has also failed to prove that her complaints were the "but for" cause of Karcher's decision to terminate her. Crawford began making complaints, which she claims alleged gender discrimination against Taylor, in July of 2013. Crawford admits that her complaints prior to April of 2016 did not lead to her termination. Rather, Crawford argues that Karcher retaliated against her for seeking investigation into who alleged that she was a "bully" and had "steamrolled" employees. However, Crawford's complaints to Karcher human resources employees about Taylor's failure to appropriately investigate allegations that she was a bully or had steamrolled employees is not protected activity. Rather, such complaints are general complaints regarding Karcher's employment practices and decisions. Because Crawford believes that her persistence in seeking a full investigation into the allegations against her led to her termination, she cannot prove that engaging in protected activity was the "but for" cause of her termination. Thus, Crawford has failed to establish a prima facie claim for gender-based retaliation.

**III.    Conclusion**

IT IS THEREFORE ORDERED that Defendant Karcher North America Inc.'s motion (Doc. 31) for summary judgment is GRANTED and Plaintiff Charlene Crawford's claims are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED this 30th day of April, 2019.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE